# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| SHARON N.,[1] | ) |
|               Plaintiff, | ) No. 20 CV 3445 |
| v. | ) Magistrate Judge Young B. Kim |
| KILOLO KIJAKAZI, Commissioner of Social Security, | ) |
|               Defendant. | ) July 27, 2022 |

## MEMORANDUM OPINION and ORDER

Sharon N. seeks disability insurance benefits ("DIB") asserting that she is disabled by hypertension, fibromuscular dysplasia, cervical stenosis and herniated disc, hypothyroidism, obstructive sleep apnea, and post-traumatic headaches. Before the court are the parties' cross motions for summary judgment. For the following reasons, Sharon's motion is denied, and the government's is granted:

## Procedural History

Sharon filed her application for DIB benefits in May 2018 alleging that she has been disabled since March 12, 2012. (Administrative Record ("A.R.") 15, 147, 176.) Her application was denied initially and upon reconsideration. (Id. at 15, 79-82, 84-86.) She sought and was granted a hearing before an Administrative Law Judge ("ALJ"). (Id. at 15, 88-92.) After a hearing in March 2019 at which Sharon appeared with her attorney and a vocational expert ("VE"), (id. at 35-59), the ALJ

---

[1] Pursuant to Internal Operating Procedure 22, the court uses only the first name and last initial of Plaintiff in this opinion to protect her privacy to the extent possible.

ruled in April 2019 that she was not disabled, (id. at 15-30). The Appeals Council denied Sharon's request for review, (id. at 1-6), making the ALJ's decision the final decision of the Commissioner, *see Jozefyk v. Berryhill*, 923 F.3d 492, 496 (7th Cir. 2019). Sharon then filed this lawsuit seeking judicial review, and the parties consented to this court's jurisdiction. *See* 28 U.S.C. § 636(c); (R. 8).

## Facts

Sharon has a college degree in aviation management and flight technology and is a certified flight instructor. (A.R. 41.) She also worked as a pilot for a commercial airline from 1998 through March 2012. (Id.) She alleges that she has been unable to work as a pilot since March 2012 because she began experiencing symptoms related to fibromuscular dysplasia and hypertension. (Id. at 176.) She submitted documentary and testimonial evidence to support her disability claims.

### A. Medical Evidence

Sharon has a history of fibromuscular dysplasia and resulting hypertension. (A.R. 298-99.) She was grounded from flying as a pilot in March 2012 because of uncontrolled hypertension, which resolved after her right renal artery angioplasty in December 2012. (Id. at 240, 298 (noting that Sharon's "blood pressures were consistently in the 118/75 range").) In May 2013 Sharon's blood pressure increased, and she started taking medication again. (Id. at 299.) She reported side effects of fatigue, dizziness, lack of interest, and blurry vision from the medication. (Id.) In April 2014 Sharon underwent another renal angioplasty procedure after suffering a

recurrence of fibromuscular dysplasia. (Id. at 332, 344.) By July 2014 her blood pressure was reported to be "much better." (Id. at 346.)

Then in October 2014 Sharon suffered a head injury which resulted in "recurrent head and neck pain." (Id. at 363, 373, 407.) In February 2015 her medical provider recommended physical therapy for her neck. (Id. at 376.) She was evaluated by a physical therapist later that month and discharged a few weeks later, having met all objectives. (Id. at 708, 721.) Thereafter, Sharon had a neck MRI, which revealed a "mild to moderate central stenosis at C3-C7, but without significant spinal cord impingement." (Id. at 512.) Sharon restarted physical therapy for cervical pain in April 2015 and was discharged a few months later in September. (Id. at 513, 730, 745.) She also received cervical injections in November 2015 and April 2016 to help relieve her pain. (Id. at 417, 425, 429.)

As for headaches, Sharon reported improvement when she stopped physical therapy in September 2015. (Id. at 394.) But a neurologist diagnosed her with chronic post-traumatic head and neck pain that November after Sharon reported occipital headaches "without neuralgiform pain or occipital numbness" four days per week and severe headaches "[a]bout three days per month." (Id. at 407-08.) The neurologist noted that Sharon was "using acetaminophen and methocarbamol as needed for headache and neck pain with good results." (Id. at 407; see also id. at 410 (noting that Sharon's "headaches that occur three to four times per week are aborted in 80% of the time by 1000 mg of Tylenol").) In April 2016 Sharon's provider prescribed Imitrex for her headaches. (Id. at 418; see also id. at 439, 446.)

3

Later that year, Sharon reported headaches occurring one time per week or every two weeks, lasting for three days. (Id. at 802.) In January 2017 her headaches increased, but after she was diagnosed with subclinical hypothyroidism and prescribed thyroid medication, her pain improved 80% to 90% by April 2017. (Id. at 448, 1020, 1024, 1036, 1040, 1044, 1053.)

**B.     Hearing Testimony**

Sharon testified that she is married and has a child who was 12 years old at the time of the hearing. (A.R. 40-41.) She stopped working in March 2012 because she experienced symptoms of rising blood pressure throughout the day and dizziness. (Id. at 43.) Sharon took medication daily and rested when she experienced these symptoms. (Id.)

In 2014 Sharon sustained a head injury and began experiencing dizziness, headaches, and neck pain. (Id. at 44-46.) She stated that her headaches occurred four to five days a week and required her to lie down for about five to six hours per day. (Id. at 48.) In 2015 and 2016 she took Imitrex for her headaches about four to five times each week. (Id.) Medication, chiropractic care, and physical therapy eventually improved her symptoms. (Id. at 45-47.)

In terms of her daily activities, Sharon said that she reads, rides horses, pilots planes, and spends time outdoors, although she said she was only able to do these activities intermittently when she "had a good day." (Id. at 49.) For example, in a typical year she said she was limited to riding horses about "once a month." (Id. at 50-51.) She also reported that she vacationed with her family in Florida once

4

a year, during which she rested and spent time on the beach. (Id.) She also sorted laundry, washed dishes, and engaged in light dusting. (Id. at 50.)

A VE testified and described Sharon's past work as copilot, which is classified as light work under the Dictionary of Occupational Titles but was heavy as Sharon performed it. (Id. at 54.) The ALJ then posed hypotheticals to the VE regarding whether someone with a specific residual functional capacity ("RFC") and Sharon's age, education, and past jobs could perform her past work. One hypothetical concerned an individual with an RFC for light work and limitations, including no climbing of ladders, ropes, or scaffolds, no exposure to hazards, no operation of commercial vehicles (including planes), and work involving simple instructions and routine tasks. (Id.) The VE testified that a person with such an RFC would be precluded from performing Sharon's past work but could perform jobs in significant numbers in the national economy, such as housekeeper cleaner, mail clerk, and cafeteria attendant. (Id.) A second hypothetical involved sedentary work with the same limitations. (Id. at 54-55.) The VE again identified jobs in the national economy that the person could perform, including final assembler, touchup screener, and table worker. (Id. at 55.)

C.  **The ALJ's Decision**

The ALJ engaged in the standard five-step evaluation process in considering Sharon's claims for benefits. *See* 20 C.F.R. § 404.1520(a). At step one the ALJ determined that Sharon had not engaged in substantial gainful activity between her disability onset date, March 12, 2012, and her date last insured, December 31,

5

2017. (A.R. 17.) At step two the ALJ found that Sharon suffers from severe impairments of hypertension, fibromuscular dysplasia, cervical stenosis and herniated disc, hypothyroidism, obstructive sleep apnea, and post-traumatic headaches. (Id.) At step three the ALJ determined that Sharon's impairments were not of listings-level severity. (Id. at 18-19.)

Before turning to step four, the ALJ found that Sharon has the RFC to perform light work with specific limitations, including no climbing of ladders, ropes, or scaffolds, no exposure to unprotected heights, and no operation of commercial vehicles including planes. The ALJ also limited Sharon to performing work with only simple instructions and routine tasks. (Id. at 19.) In explaining this RFC, the ALJ pointed to objective medical evidence including diagnostic images, examinations, and treatment, and opinion evidence. (Id. at 20-27.) The ALJ concluded at step four that Sharon could not perform her past relevant work as a copilot. (Id. at 28.) But because the VE opined that a person with Sharon's RFC could perform other jobs that exist in significant numbers in the national economy, such as cleaner, mail clerk, and cafeteria attendant, the ALJ concluded that Sharon was not disabled. (Id. at 29.)

## Analysis

Sharon claims that the ALJ erred by: (1) not properly accounting for her headaches in assessing her RFC; and (2) relying on her activities of daily living without considering her limitations in performing those activities. (R. 17, Pl.'s Br.) When reviewing the ALJ's decision, the court asks only whether the ALJ applied

6

the correct legal standards and whether the decision has the support of substantial evidence. *See Burmester v. Berryhill*, 920 F.3d 507, 510 (7th Cir. 2019). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019) (quotation and citations omitted). This is a deferential standard that precludes the court from reweighing the evidence or substituting its judgment for that of the ALJ's, allowing reversal "only if the record compels a contrary result." *Deborah M. v. Saul*, 994 F.3d 785, 788 (7th Cir. 2021) (quotation and citation omitted).

**A.     RFC Assessment**

Sharon argues that the ALJ erred by not accounting for her headaches in assessing her RFC. (R. 17, Pl.'s Br. at 11-12.) The RFC measures the maximum a person can do despite her limitations and must be based on "all the relevant evidence" in the record. 20 C.F.R. § 404.1545(a)(1); *see also Pepper v. Colvin*, 712 F.3d 351, 362 (7th Cir. 2013). In assessing a claimant's RFC, the ALJ "must give substantial weight to the medical evidence and opinions submitted, unless specific, legitimate reasons constituting good cause are shown for rejecting it." *Chambers v. Saul*, 861 Fed. Appx. 95, 101 (7th Cir. 2021) (quoting *Knight v. Chater*, 55 F.3d 309, 313 (7th Cir. 1995) (quotations omitted)). Nevertheless, a flawed RFC assessment will not justify remand unless the claimant can identify additional limitations not already included in the RFC. *See Pavlicek v. Saul*, 994 F.3d 777, 784 (7th Cir. 2021); *Jozefyk*, 923 F.3d at 498.

Here, the ALJ considered medical evidence showing that Sharon suffered from post-traumatic headaches and accounted for limitations supported by the record. *See Cervantes v. Kijakazi*, No. 20-3334, 2021 WL 6101361, at *2 (7th Cir. Dec. 21, 2021). More specifically, at step two the ALJ evaluated the evidence regarding Sharon's headaches and determined they qualified as a severe impairment. (R. 17, Pl.'s Br. at 11; see also A.R. 17.) And in assessing Sharon's RFC, the ALJ considered Sharon's reports of "daily dizziness," neck pain, and headaches, including her reports from 2014 that she experienced dizziness about once a day for five minutes and from 2015 and 2016 that she took Imitrex four to five times a week to treat her headaches, which sometimes required her to lie in bed for five to six hours. (Id. at 19-20.) The ALJ found, however, that Sharon's dizziness was only occasional and has since improved, physical therapy helped her headaches over time, and she was still able to "ride horses once monthly" and take annual vacations to Florida. (Id.) Thus, the ALJ determined that the limiting effects of Sharon's headaches were not as severe as claimed. (Id. at 22-24.)

In so finding, the ALJ relied on Sharon's May 2015 neck MRI that—as discussed—revealed "mild to moderate central stenosis at C3-C7 without significant cord impingement," and observed that Sharon "was treated with physical therapy with good relief," met all therapy goals, and was discharged in September 2015. (Id. at 22-23.) The ALJ also pointed out that a neurological follow-up record from the same month indicated that Sharon's symptoms had improved, with her headaches occurring only during "intense physical therapy." (Id. at 23.) And the ALJ

8

considered that over-the-counter medication and a muscle relaxer effectively treated Sharon's headaches and neck pain, such that she was experiencing only about "three severe headaches monthly" as of November 2015, when Sharon also had a normal neurological examination. (Id.) Further, while Sharon visited her orthopedic surgeon and reported neck pain, headaches, and high blood pressure the following October, the ALJ noted that she also denied weakness and numbness and had: 5/5 motor strength; intact sensation; a stable gait; and a negative impingement sign. (Id. at 24.) She also declined injections and surgery. (Id.) A few months later in January 2017, Sharon reported "increased headaches over the past few months," and the neurologist prescribed prophylactic treatment. (Id.) Considering the totality of the objective medical evidence, the ALJ concluded that despite suffering headache pain, Sharon generally was "able to function," including by participating in "physical therapy and other physical activities." (Id.)

As for the opinion evidence, the ALJ found that the state agency medical consultants—who reviewed Sharon's medical record and found "insufficient evidence" to establish severe impairments—were not "persuasive or helpful." (A.R. 27.) The ALJ evaluated the evidence and found substantial support for her step-two finding that Sharon suffers from the severe impairments of hypertension, fibromuscular dysplasia, cervical stenosis and herniated disc, hypothyroidism, obstructive sleep apnea, and post-traumatic headaches. (Id. at 17.) As a result of those impairments—specifically the pain and fatigue associated with Sharon's post-traumatic headaches—the ALJ limited Sharon to light work and no climbing of

9

ladders, ropes, or scaffolds, no exposure to hazards, no operation of commercial vehicles, and work involving only simple instructions and routine tasks. (Id. at 19, 27.) The court finds that the ALJ sufficiently discussed Sharon's headaches and supported her RFC with substantial evidence. *See Pepper*, 712 F.3d at 363.

Nevertheless, Sharon argues that the ALJ erred by not incorporating additional limitations relating to her headaches into the RFC. (R. 17, Pl.'s Br. at 11-12.) Specifically, Sharon contends that the ALJ should have considered "the impact that headache symptoms may have on sustaining concentration and attention." (Id.; see also R. 22, Pl.'s Reply at 2.) But Sharon did not cite any examination records showing that she had difficulty sustaining concentration or attention. By contrast, the ALJ cited mental status exam records noting that Sharon was oriented with "attention and concentration . . . within normal limits," (A.R. 24 (citing id. at 1016)), and that she had "[n]o apparent abnormalities in attention or concentration," (id. at 25 (citing id. at 461)). The ALJ was required to incorporate in the RFC only limitations supported by evidence. *See Cervantes*, 2021 WL 6101361, at *2. Here, the ALJ adequately explained how she supported her RFC with substantial evidence, including "the medical evidence, good results with treatment, medications, physical therapy, injections, diagnostic testing, objective exam findings on presentations, and [Sharon's] array of activities." (A.R. 27.)

### B. Activities of Daily Living

Sharon argues that the ALJ improperly found she could perform light work with limitations based in part on her daily activities, without considering how she

10

actually performed them. (R. 17, Pl.'s Br. at 12-14.) An ALJ's symptom evaluation is entitled to great deference because of the ALJ's ability to observe firsthand the believability of the claimant's symptom descriptions. *See Murphy v. Colvin*, 759 F.3d 811, 815 (7th Cir. 2014). As such, a reviewing court may reverse a symptom assessment only where it is "patently wrong." *Id.* at 816. The court will not disturb an ALJ's evaluation of a claimant's symptom description if it is logically based on specific findings and evidence in the record. *See id.* at 815. "[A]lthough ALJs do not need to address every piece of evidence in the record, an ALJ may not ignore an entire line of evidence contrary to its ruling." *Grotts v. Kijakazi*, 27 F.4th 1273, 1278 (7th Cir. 2022).

Sharon criticizes the ALJ's evaluation of her daily activities. (R. 17, Pl.'s Br. at 12-14.) But the Seventh Circuit has cautioned that such an argument "invit[es] [the court] to reweigh the evidence," rather than to "merely examine whether the ALJ's determination was reasoned as supported." *Grotts*, 27 F.4th at 1279. Here, the court finds that the ALJ supported her analysis of Sharon's daily functioning with substantial evidence. To be sure, despite Sharon's claims that she was unable to work, the ALJ observed that Sharon was able to perform "very significant" daily activities "indicat[ing] an ability to perform light work." (A.R. 26.)

Specifically, the ALJ cited physical therapy records noting that Sharon engaged in activities such as the following:

> exercising daily; standing for a long time at a horse auction all weekend [and] on feet all day; fishing all day with climbing up/down hills; fishing, playing bags and standing a lot; dr[iving] to Tennessee; . . . attend[ing a] flea market all day; standing [a] long time at [a] car

11

> show; [taking] numerous vacations; . . . walking a lot; [taking] five mile walks/hikes; taking down her dad's garage; painting a room; going out of town; [going] to the beach . . .; and riding a horse.

(Id.) Sharon further reported "gardening, [doing] laundry, shopping, going to [the] library, helping [her] mom, walking in [the] mall, being busy, overdoing it, cleaning out [the] basement, and babysitting a toddler." (Id.) Treatment records noted that Sharon was able to take vacations to Germany and Florida, (id. at 18 (citing id. at 1015, 1074), 20 (citing id. at 51-52)), and she was "physically active, mainly doing physical therapy several times per week" and "rid[ing] an exercise bike," (id. at 21 (citing id. at 320)). The ALJ found these activities inconsistent with Sharon's reports that she lacked "stamina and energy" because of "tiredness and fatigue" and that she needed to lie down frequently because of the frequency and severity of her headaches. (Id. at 26-27.)

Sharon contends that the ALJ did not account for her limitations in performing such activities. (R. 17, Pl.'s Br. at 13.) For example, Sharon testified that she could only ride a horse when she was having a "good" day, about once a month. (Id. (citing id. at 49-50).) Sharon also asserts that she did "restful things" on vacation and stayed active despite needing to lie down and nap frequently. (Id.) But as discussed, the ALJ cited objective evidence and treatment efficacy, which she found inconsistent with Sharon's testimony. (A.R. 20-27.) The ALJ's determination is well-reasoned and supported by substantial evidence. *See Grotts*, 27 F.4th at 1279.

## Conclusion

For the foregoing reasons, Sharon's motion for summary judgment is denied, and the government's is granted.

**ENTER:**

_____
**Young B. Kim
United States Magistrate Judge**